**W. Dave JOHNSON, Appellant,**

v.

**C. N. AVERY, Jr., et al., Appellees.**

No. 11371.

Court of Civil Appeals of Texas.

Austin.

March 16, 1966.

Rehearing Denied March 30, 1966.

Long, Aronson & Coleman, Tom Long, Moore & Johnson, Gerald G. Moore, Austin, for appellant.

McKay & Avery, John J. McKay, Charlie D. Dye, Austin, for appellees.

PHILLIPS, Justice.

This suit arises out of a conflict of jurisdiction between two district courts in a controversy involving the same subject matter.

Appellant, W. Dave Johnson, filed suit in the 53rd Judicial Court of Travis County, Texas, against one of the appellees, C. N. Avery, Jr., who had previously filed a suit concerning the identical subject matter against the appellant in the 126th Judicial District Court of Travis County, Texas.

Appellee, C. N. Avery, Jr., filed a plea in abatement in the second case asserting the pendency of the prior suit in the 126th District Court. In opposition to this plea, appellant asserted that appellee fraudulently induced appellant's attorneys to delay the filing of appellant's suit in order that appellee could file his first thus gaining the valuable right for himself of opening and closing the evidence and arguments at trial.

The 53rd District Court found that appellant's attorneys had been fraudulently induced to delay the filing of appellant's suit and accordingly denied appellee's plea in abatement and ordered the parties to trial on the merits of the case.

Subsequent to the hearing on the plea in abatement and the order of the 53rd District Court, the 126th District Court, after a hearing lasting nine days, issued a temporary injunction enjoining appellant and his counsel from taking any further action in the 53rd District Court stating that the injunction was issued without prejudice to defendant and his attorneys to proceed in the cause and on appeals from the cause, "as permitted by law, the rules of procedure and evidence, and to litigate, defensively or affirmatively in this cause, such bona fide causes of action if any they have, as against plaintiffs, arising out of the controversy between the parties thereto."

Appellant is here on appeal from the order of the court which granted the temporary injunction.

We affirm the judgment of the District Court and sustain its order granting a temporary injunction.

I.

The injunctive proceedings before us were supplementary or auxiliary to the main case filed June 14, 1965 by C. N. Avery, Jr. et al against appellant in the 126th District Court seeking (among other relief) a permanent injunction against appellant to enjoin him from continuing a course of harassment and threats against appellees de-

scribed in appellees' petition below as "vexatious, oppressive and ruinous litigation, all without foundation and solely to harass, annoy and wreck malice upon plaintiff Avery and his family. For these reasons injunctive relief herein will be sought under the protective and equitable powers of the Court which are here invoked."

As we stated above, the court heard the phase of the case before us for nine days. The record is extensive and well developed for present purposes. We can only present a brief summary of the evidence here.

Appellant Johnson, his father before him, and his family, as of 1962, owned the controlling stock interest in a local company, Texas Quarries, Inc. This consisted approximately of 3,206 shares, or about 60% of the company.

Of the company's 5,276 shares outstanding the other 40% of the stock was owned by some 26 stockholders. Of this group of minority stockholders, the appellees herein, C. N. Avery, C. N. Avery, Jr., Robert L. Phinney and wife, Thomas E. Nelson, Jr., and Lewis N. White owned approximately 650 shares; Avery, Jr. owned 35 shares. The largest shareholder of the Avery family group was T. E. Nelson who owned 330 shares.

Appellant was also the sole stockholder of another company, West Texas Stone Company. None of the other Texas Quarries' stockholders owned any of its stock. None of the other stockholders in Texas Quarries were either directors of or officers of West Texas Stone, save appellant Johnson, and he, his wife, and one P. L. Brady, III were its directors. Both Texas Quarries and West Texas Stone were in similar businesses of quarrying limestone.

Appellant became president of Texas Quarries in 1953. Its directors in 1962 were appellant, Mr. C. H. Kasch, (deceased at time of trial of this case), Kenneth McCalla, C. N. Avery, Sr., and C. N. Avery Jr. C. N. Avery, Jr.'s. law firm were attorneys for Texas Quarries.

Unknown to the Averys, appellant, after becoming president of Texas Quarries in 1953, began a course of conduct whereby he caused checks to be drawn on that company payable to his wholly-owned company, West Texas Stone. By the year 1962 these withdrawals had accumulated to approximately $151,000.00.

To keep the books balanced, appellant had these withdrawals carried as "accounts receivable" on the books of Texas Quarries. On the books of his sole-owned West Texas Stone Company, he carried these sums as "paid in surplus."

Appellant never reported this practice to the other directors but Directors Kasch and McCalla knew about appellant's conduct concerning the funds of Texas Quarries, inasmuch as one of them was treasurer and the other manager of the company.

Under date of May 29, 1962, Kasch and McCalla wrote appellant a "personal and confidential" letter, which, among other things, expressed their concern for the affairs of the company; their concern for his use of the company assets for purposes foreign to its best interests, pointing out that he had obtained $150,000 cash advances for his West Texas Stone Company; that this latter company had use of Texas Quarries' equipment valued at $40,000; that he charged to his personal drawing account over and above his salary, some $14,700; that West Texas Stone had sold Texas Quarries some of its bonds, and that he was depleting Texas Quarries' assets at the rate of approximately $5,000 a month. He was reminded of his fiduciary duties as a director, and it was pointed out to him that the company was in such dire condition that it might not be able to recover therefrom, and that his handling of company affairs "is highly improper." The Averys were not advised of this letter or of the situation.

Appellant also admitted that Texas Quarries banked at The American National Bank, and that he knew it was receiving financial statements from time to time

which described these funds he had transferred to be "accounts receivable."

In the letter of May 29, 1962, appellant was also informed by Kasch and McCalla that they were sure that if the bank knew of these acts, it would not extend additional credit and its notes would "very likely be called." Nevertheless, appellant did not change his methods, and he admitted that he had never revealed to Avery, Jr. how he had handled the company's funds.

Finally, in early September, 1962, Kasch and McCalla brought a copy of their letter of May 29th to appellee Avery, Jr., informing him of appellant's mishandling of the Texas Quarries affairs and conferring with him as to what should be done. He informed these men that immediate action to stop these "advances" should be taken, and that The American National Bank should be immediately notified concerning the misrepresentations made to them in the company's financial statements.

As of this time, Texas Quarries carried a $75,000.00 unsecured note with The American National Bank. The bank's officers had, from time to time, discussed the financial condition of Texas Quarries with Avery, Jr., and he had given them his opinion that the company was a good risk. He also was aware that the bank had relied on the financial statements furnished it. Neither Johnson, his father before him, nor anyone else had ever informed Avery, Jr. of this transferring and appropriation of the company funds, and when Kasch and McCalla did reveal the situation to him, and asked his advice, they told him the company was in dire condition. They also told him the company had to have additional loans. Acting as attorney for the company and as a member of its board of directors, Avery's advice was that they discuss this matter with the bank at once, and Kasch, McCalla and Avery having so agreed, did go to the bank and did discuss the situation with various bank officers.

The bank was displeased with this situation and the bank's officers had various

further discussions with Avery, Jr. The bank's position was that if Johnson remained as president of the company the bank did not wish to do any further business with it and would refuse it further credit. Further, it was the position of the bank that Avery, Jr. was the only other person sufficiently familiar with the company's affairs who would be acceptable to the bank as company management if the bank was to try to help pull the company through its bad condition and help get it straightened out. Furthermore, the bank made it clear to Avery that he was to inform the others of the bank's views, and this he did.

The directors were also of the opinion that Johnson should make restitution for his misappropriation of the company funds, and give the company a West Texas Stone company note, guaranteed by him, and secured by 888 shares of Texas Quarries stock. Appellant Johnson presided at a directors' meeting on September 6, 1962, where he agreed to do this.

Eventually, at the bank's continued insistence, at a further directors' meeting held November 13, 1962, Johnson resigned as president. Avery, Jr. was elected to that position, and Johnson was given a "leave of absence" with pay. As Avery explained, his family had known appellant and his family for years, that appellant's aunt had married Mr. Avery, Sr., and no one had any desire to spread around or publicize the acts of Johnson or the condition of the company; that there was an understanding with Johnson about his taking a leave of absence and Avery's taking over temporary management and that the minutes would so reflect; that a letter to the stockholders was accordingly prepared and so couched as to save Johnson from embarrassment. As reflected in said minutes of the November directors' meeting, and as admitted by Johnson, it was understood that the bank held the 888 shares as trustee and could, if it desired, vote them.

Johnson could not pay this note, and a year later executed a renewal and extension, and finally, when he could not pay on the extended due date, agreed, in writing in 1964, that the 888 shares of stock should be turned over to Texas Quarries in partial satisfaction of his indebtedness to it.

Avery, Jr. employed a certified public accounting firm to audit the company books, and while he remained president retained said firm to currently audit the company books.

Avery, Jr. remained president from November, 1962 to August, 1964. Under his management Texas Quarries enjoyed a strong and rapid recovery. The bank loaned it sums aggregating $250,000 of which $125,000 was secured by a deed of trust on the company's properties and the balance were demand notes. With these funds the company secured various large contracts and jobs and it enjoyed substantial prosperity. In fact, the statement of Mr. A. G. Adams, Vice President of The American National Bank, reflects the situation under Avery's management.

"As a result of his taking over the management of that company, I can state that the company was afforded a line of credit not otherwise available to it, and from said financial statements as furnished by him during the 1963-1964 period the company steadily gained in strength and in stability so that by the middle of 1964 it was apparent that the company, under Mr. Avery's general supervision, had so increased its worth that it would in a few months be able to retire all of its indebtedness to this bank when it had collected on its outstanding jobs. Furthermore I will state that during the last half of 1963 and throughout 1964 the company began to reduce its indebtedness to this bank and all of its debts to the bank were paid off in full by December, 1964."

Accordingly, having done his job, Avery, Jr. offered to resign as president in Au-

gust, 1964, and did resign. The management of the company was placed with Mr. McCalla. By this time the affairs of the company had been straightened out, it was in condition to retire its bank debts, and the bank, as expressed by Mr. A. C. Bull, Chairman of the Board of the bank, was willing for Avery, Jr. to "turn the reins of the company" to someone else.

The only remuneration to Avery, Jr. for his services was the sum of $500.00 per month as a salary for acting as president, and his law firm received an equal sum per month for legal services rendered. The only other thing of value which may be considered to have moved to the Averys after 1962 was the fact that the equity of the stockholders was naturally increased as the affairs of the company were strengthened, but this was a benefit all stockholders received. Furthermore, the control of the company still remained in the hands of Johnson's family.

Mr. Johnson admitted that at no time since his removal as president of the company had his family or other substantial stockholders taken any action to re-elect him as president of the company.

As of August, 1964, when Avery, Jr. resigned as president of Texas Quarries, and since February, 1964, its directors were Avery, Jr., Kenneth McCalla, Jr., T. E. Nelson, Jr., Fletcher King and George Reed. The affairs of the company having been put in order, and its finances in excellent condition, appellant Johnson began the following course of conduct.

By letter of August 4, 1964, he wrote Texas Quarries, offering to sell it the stock of West Texas Stone Company for $150,-000.00. The financial statement attached to the offer showed that company to have a net loss of $251,873 for prior years, a 6 months, 1964, net loss of $17,420, and this taking into account the "paid in surplus" (source being the appropriated funds of Texas Quarries). In other words, the company was for all purposes defunct. The directors of Texas

Quarries refused this offer. Furthermore, it was undisputed that even if Texas Quarries had wanted to accept this offer, appellant Johnson did not have the stock of West Texas Stone for sale, because it was pledged at the bank to secure certain bonds.

The above offer having been rejected, appellant Johnson next turned his attention to the Avery family, and wrote them a letter on August 28, 1964, containing a proposition to acquire the stock of various other persons at $50 a share, while he proposed to sell his own stock to them at $150 a share, the scheme being one to place "control" of the company in the hands of the Avery family. This offer was rejected.

Again, by letter of December 11, 1964, an offer was made to Texas Quarries to sell it various equipment of West Texas Stone, in which letter Johnson admitted that such equipment was subject to liens, including tax liens. Nothing came of this offer, Texas Quarries refusing to accept it.

Next, appellant caused his attorney to write the directors of Texas Quarries a letter dated March 4, 1965, complaining about the fact that no greater dividends had been made, and stating that "each of you is hereby put on notice" that if the company was required to pay accumulated earnings taxes, Mrs. Johnson and Mr. Owens will take whatever legal action is necessary "to hold each of you, personally, and on a joint and several basis, liable to the corporation for the total amount that the stockholders' equity in the company is reduced as a result of the payment of such taxes."

In behalf of appellant, his attorney also sent the Board of Directors another letter, March 9, 1965, enclosing an offer to sell Texas Quarries the West Texas Stone Company stock for $100,000. This offer included a proposition that Texas Quarries would release appellant from any liability. The letter of transmittal gave many reasons why this offer should be accepted, and concluded with these propositions:

(a) If the offer was not accepted, Johnson and West Texas Stone Co. had no alternative than to immediately take voluntary bankruptcy;

(b) If this was done, they would have a claim against Texas Quarries "for rescision and restitution" of 490 shares of stock transferred by Johnson to Texas Quarries December 28, 1964;

(c) West Texas Stone Company would have a claim against Texas Quarries for violation of the Texas and Federal Antitrust Laws;

(d) Texas Quarries should be aware of the fact that the Trustee would question the transfer of the 888 shares and the 490 shares of stock of Texas Quarries. The letter further stated that these transfers "can be set aside, etc."

These offers were not accepted.

Next, and before the trial below, an additional offer was made to Texas Quarries by appellant's attorney's letter of June 29, 1965. This offer was different in that the proposition was to sell to Texas Quarries the assets of West Texas Stone Company, and in event of its refusal, to sell to others. Counsel for appellant stated that he knew that the stock of West Texas Stone was held in trust to secure some bondholders.

Texas Quarries owns $7,200 worth of West Texas Stone Co. bonds, which are convertible into its stock and appellees contend that if this type of a transaction is carried out with third persons, it would injure Texas Quarries, and if Texas Quarries carried it out itself, it would result in injury to actual or potential stockholders other than Texas Quarries.

Before June 5, 1965, Johnson's attorney had drafted a petition naming C. N. Avery, Jr., as the defendant and said attorney discussed this petition with members of the law firm he was associated with at that

time. By June 6, 1965 he had resigned from that firm. He had likewise shown this petition to Mr. Kenneth McCalla and to Mr. Dudley McCalla, an Austin attorney, prior to June 9, 1965, and Avery was informed by June 9th that such a petition existed.

Appellant's attorney called Avery, Jr., on June 10th, and arranged an appointment for June 11th. On June 11th, said attorney called at Avery's offices and left a copy of this petition with him, telling him he would give him an opportunity to consider it and make a settlement. Said attorney describes his action as bringing the petition "as the initiation of an offer of compromise and settlement," and that this was a "settlement conference" and admitted:

"Q * * *

Now, the only reason why you shouldn't and wouldn't file that lawsuit was that Mr. Avery or his family would pay your client a sum of money sufficient to satisfy you to prevent filing the suit; wasn't that true?

A Yes, sir, that is exactly right."

Appellant testified, concerning this procedure, that the petition was left with Mr. Avery to give "him the opportunity * * * to make an offer." Appellant further testified that the reason the petition was taken to Mr. Avery was "To give Mr. Avery an opportunity to offer a compromise settlement out of Court." He said he made it "clear" to Avery that the contact was "to explore settlement."

Appellant's attorney was warned by Mr. Robert McGinnis, a senior member of the law firm he had been associated with: "I told Mr. Moore that I felt that the allegations in this petition were of an extremely serious nature, that I felt that there would be a definite injury to the reputation of the defendant if this suit were filed, * * *." He also stated, "I further explained to Mr. Moore that I felt that Mr. Avery enjoyed a very good reputation in the City of Austin, that I felt that the filing of such a petition would constitute an actual injury to Mr. Avery, * * *." Also he was informed that a fraud suit was different, particularly when filed against a person of good character, and that such a petition "should not be lightly filed." Of his law firm, Mr. McGinnis further said that he considered that appellant's attorney "had very definitely the feeling that the firm would not sign the petition and would not file the lawsuit; * * *."

Appellant's attorney himself told Mr. Avery that the allegations in the petition were "extremely grave."

Prior to filing such petition, said attorney was specifically warned by C. N. Avery, Jr.'s attorneys that based upon their personal knowledge there "wasn't any truth whatsoever in the claims in said petition," and specifically inquired whether said counsel had investigated the facts.

Not only is it considered that C. N. Avery, Jr. is an attorney of high repute in his profession, but his family has held offices of public trust. He himself is a former Assistant Attorney General, former president of the Austin School Board, former president of the Austin Lions Club, and former president of the Headliners Club, a trustee and treasurer of the Board of St. Edward's University, president of the Development Board of that University, a trustee of St. Andrews School, member of the Board of Directors, American National Bank, and a retired Lt. Colonel in the Army.

Mr. A. C. Bull, called as a witness by appellant, testified on cross examination to the high character and reputation of appellees, and when asked whether the filing of the suit of appellant against Mr. Avery, Jr. would injure the reputation of Mr. Avery and his family stated, "Why, certainly it would."

Appellant's petition filed in the 53rd District Court is filled with serious charges described by appellees as malicious and false

charges of fraud. The allegations are each prefaced with legal conclusions such as charges of "bad faith," "intent and design to deceive," "fraudulent misrepresentations" and "concealments," and with each, that the said Avery did "falsely and fraudulently, etc." The factual charges against Mr. Avery are:

That he represented that the account with West Texas Stone Company was a valid and enforceable debt owned by one independent corporation to another, and that David Johnson was legally obligated to pay to Texas Quarries the sums heretofore set forth as having been taken by Johnson from Texas Quarries for his use in his wholly owned company.

That he prepared the note and collateral agreement, and advised Johnson that he was obligated to sign them and a renewal agreement thereon.

That he represented to the Board that the bank was displeased about the matter of the $151,000 "accounts receivable," reflected in the bank statements, and would call its loans and not extend additional credit unless Johnson resigned as president and Avery, Jr. was elected president.

That Mr. Avery, orally, and by statements in the minute book, caused stockholders to believe that Johnson had been guilty of gross mismanagement and criminal acts.

That he, by drafting minutes, and by letters, caused stockholders to believe Johnson voluntarily executed the note and collateral agreement and resigned.

That he caused the stockholders to believe that he, Avery, was elected president at the demand and with the approval of the bank, and as a condition to further loans from the bank.

That he wrote a memorandum of law to the directors, causing them to believe it was impossible, etc. for a corporation to enter into a partnership agreement with another corporation.

That he caused stockholders to believe that Johnson had combined with others to hand over control of the company to its competitors.

That he caused the stockholders to believe his salary as president was $200 a month when it was $500.

That on February 11, 1963, he transferred the 888 shares of stock to the bank without knowledge or approval of Johnson or the company.

That a drafting of new by-laws was illegal, etc.

That he caused the company's 90-day notes at the bank to be changed to demand notes.

That he caused the company to mortgage its properties at the bank for a $125,000 loan.

A charge that Mr. Avery stood in a "fiduciary and confidential relationship" with Johnson, and was the latter's "personal" attorney, hence Johnson relied on him, and had no way of knowing the above acts were false, etc.

This petition sought damages in excess of $700,000.00.

During the nine days that the court heard evidence in this case not a shred of evidence was produced to substantiate any of the allegations asserted by appellant in his petition. On the contrary, extensive testimony presented on behalf of appellees by officials of The American National Bank and others conclusively refuted these assertions. It would unduly lengthen this opinion to discuss this evidence in detail. It can best be summarized in the findings of the court:

"The defendant himself testified at length, and admitted that he, personally, had no knowledge that any of the acts set forth in his said petition were fraudulent or deceitful or false, and testified affirmatively that it was his attorney, Mr. Moore, who had the facts as to such acts constituting fraud, deceit, etc. The de-

fense wholly failed to present to this Court any credible evidence of any kind or sort that any of such acts or conduct constituted a fraud or wrong of any sort committed by plaintiff C. N. Avery, Jr. To the contrary, the very great weight and preponderance of the evidence, and the overwhelming evidence was to the effect that none of said accusations contained in defendant's petition were true, or had any basis in fact. The evidence was further clear and convincing to this Court that had the defendant, his attorney or authorized representative ever made inquiry of the bank's loan officers or other officers having knowledge of the facts regarding its requirements, its position as regarded Mr. Johnson, and the demands upon and transactions with plaintiff Avery, the true facts would have been given them, including the demands of the bank as above alluded to, and the Court further finds that defendant's attorney Mr. Moore knew that Mr. Adams, one of the vice presidents of said bank, had serviced the Texas Quarries' accounts, and that its chairman of the board had information and the true facts, but at no time did said counsel make inquiry of any of said officers to the and beyond the time of presentation of his said draft of petition used as a basis to demand settlement of plaintiff Avery, Jr. This Court further finds that there was no reasonable excuse or reason given throughout this hearing for the failure of the defense to have first made some fair effort to check the truth of the various allegations made, and that the conduct of the defense throughout this hearing has demonstrated that the petition of the defendant Johnson (against filing and prosecution of which the equitable jurisdiction of this Court was previously invoked), was and is a vexatious petition, drawn to threaten and obtain money from plaintiff Avery, Jr., and his family, and to place him and the remaining plaintiffs under duress."

The court also found that these two companies were entirely separate in entity, and plaintiffs and other minority stockholders in Texas Quarries had no interest whatsoever in defendant's West Texas Stone Company. And the court further found, in striking down the contention that these companies were in a partnership arrangement that:

"The facts of the matter are that there was never any such relationship, none being shown by defendant, and it not being shown that, by charter power, or by resolutions of the directors of said companies, or by applicable law, that any such relationship existed in fact or could exist in law, and plaintiff's statements or opinions as to the law in this regard were and are the law, and were honest expressions thereof, to protect said Texas Quarries from the fictitional artifice of defendant, which if allowed recognition, would have allowed both him and his company to escape their just obligations to Texas Quarries for the wrongs perpetrated against that company and its stockholders."

The court found further that as to this entire matter, Avery enjoyed no personal gain by assuming the presidency of the company "and the legitimate interest of defendant Johnson, to the extent that he, through his wife, still held stock in the company, and the interests of the Johnson family who were stockholders, were better served under the management of this plaintiff and no wrongs were perpetrated upon defendant, and his claims to the contrary are false."

As to the vexatious action filed by appellant, the court found:

"The conduct of the defense, in violating the jurisdiction of this Court by proceeding to file such suit subsequent to the filing of this suit, and failing to show a reasonable investigation for the truth prior to drawing and filing such a vexatious pleading, and as evidenced throughout this hearing, leads this Court to the conclusion that the action of which plaintiffs complain is, in the fullest sense of the terms, a vexatious, groundless action,

drawn to embarrass and humiliate, harass and foster unjust vengeance upon innocent persons, including the plaintiff C. N. Avery, Jr., and is therefore condemned by the Court as such. The Court makes these findings in light of the fact that in no instance, as to any of said charges, did the defense offer any credible evidence upon which this Court could conclude that a justiciable issue might exist as to any of the charges made. * * *

Furthermore, the Court finds that from the time the plaintiffs did seek the equitable protection of this Court, the defendant and his attorney have sought to evade and defeat this Court's jurisdiction and did also immediately commence a practice of undue and unjustifiable harassment by seeking to take the depositions of plaintiff C. N. Avery, Jr. on the Fourth of July weekend, when it was well known that the said plaintiff's opportunity to invoke the protection of Rule 186b, TRCP would be at a minimum (this being also the weekend of the State Bar Convention), and although this Court had quashed such deposition proceedings, defendant's attorney nevertheless flaunted this Court's order and caused a telegram to be sent to plaintiff's attorney during the midnight hours of July 2, 1965, declaring that he would nevertheless propose to take and would be ready to take such deposition on Saturday, July 3, 1965."

II.

Appellant is before us on five points of error, the first two briefed together are that of the trial court in issuing a temporary injunction against the appellant in that the 53rd District Court had acquired dominant jurisdiction in the suit and for that reason the 126th District Court was without right or power to interfere; the error of the court in issuing said injunction because the order of the 53rd District Court overruling appellees' plea in abatement was interlocutory and based on a finding of fact and can only be reviewed by an appellate court aft-er a final judgment is rendered in that cause.

We overrule these points.

This is an appeal from a temporary injunction as provided by Art. 4662, Vernon's Ann.Civ.St. and Rule 385, Texas Rules of Civil Procedure.

In University of Texas v. Morris, 162 Tex. 60, 344 S.W.2d 426, the Supreme Court held that a District Court having jurisdiction of parties and subject matter may enjoin a party from prosecuting a cause of action in another court when such relief is necessary to avoid vexatious litigation or prohibit the use of judicial processes for purposes of harassment. The court also held that while courts are open to all persons for litigation of their claims and demands, judicial processes cannot be used for purposes of mere harassment in an effort to effect a settlement.

■■■ While the court noted in the Morris case that the injunctive process used to deter the filing of suits is a device that should be used sparingly, the facts of the case at bar are such that the trial court did not abuse its discretion in issuing the injunction. We hold that under the power of the court to protect its jurisdiction and also under the equity power of the court to protect a petitioner from irreparable injury where his remedy at law is inadequate that the court was correct in granting the injunction. A reputation for honesty and integrity built by a lawyer over the years is a valuable asset. As such it cannot be dealt with lightly. While the doors of our courthouses are open to all with legitimate grievances as well as to many whose grievances later prove to be groundless, an attack on one's reputation for integrity where the charges are patently groundless and the obvious purpose of the suit is to vex or harass or compel a settlement will be abated by a court of equity. For obvious reasons, a remedy at law would only serve as a fulcrum to such a scheme.

■ The rule is well settled in this State that where a suit has been filed in a court of competent jurisdiction, that court has the power and the right to exercise the active jurisdiction in the suit and no subsequent court in which a suit over the same subject matter is filed at a later date has right or power to interfere. Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063.

■ The record discloses that appellees filed their suit in the 126th District Court first. Appellant does not question this rule but contends that the 53rd District Court has jurisdiction over this case due to an exception to the rule. This exception is stated in cases such as Russell v. Taylor, 121 Tex. 450, 49 S.W.2d 733 and V. D. Anderson Co. v. Young, 128 Tex. 631, 101 S.W.2d 798. These cases state an exception to the general rule announced in Cleveland v. Ward to the effect that a party may be guilty of such conduct relating to the matter of first filing as to estop himself from asserting the prior active jurisdiction of the court in which the suit is first filed over another court in which a suit containing the same subject matter is subsequently filed. This exception has no application here.

The injunction was brought under the equity power of the court to protect the appellees, temporarily, from irreparable injury where his remedy at law was inadequate. Before seeking the protective arm of the 126th District Court, appellee appeared before the 53rd District Court, presented his plea in abatement wherein he cited the court to the prior lawsuit and was overruled. Here his legal remedy was exhausted.

The abovementioned exception relied on by appellant does not apply for several reasons. Under his theory of equitable estoppel he must have come before the 53rd District Court with clean hands. This he could not do. In the cases cited by appellant to support his position in this regard, the prevailing parties were due equity by virtue of the conduct of the counter parties. Another difference is that the controversy in these cases was not brought in equity but in law thus making the choice of the forum (except for the usual considerations in a question of venue) unimportant. Both courts had similar jurisdiction.

Appellant's third point of error is: "The 126th Judicial District Court erred for the reason that contrary to Article 4656, Texas Revised Civil Statutes, 1925, the temporary restraining orders and the temporary injunction restraining appellant from proceeding further in the cause pending in the 53rd Judicial District Court were not made returnable to the 53rd Judicial District Court, and, as such, said temporary restraining orders and temporary injunction were void.

We overrule this point.

■ Appellant's point is not well taken for two reasons: First, Article 4656 [1] applies to proceedings to stay a suit or execution on a judgment. The injunction here restrained the appellant and his attorney as persons or parties. Secondly, this injunction is ancillary to the main action and it is well established that such ancillary writs do not come within the purview of the statute. See Lindley v. Easley, Tex.Civ.App., 59 S.W.2d 927; Fielder v. Parker, Tex.Civ.App., 119 S.W.2d 1089.

1. "Art. 4656, 4653, 2996 Jurisdiction for trial

Writs of injunction granted to stay proceedings in a suit, or execution on a judgment, shall be returnable to and tried in the court where such suit is pending, or such judgment was rendered; writs of injunction for other causes, if the party against whom it is granted be an inhabitant of the State, shall be returnable to and tried in the district or county court of the county in which such party has his domicile, according as the amount or matter in controversy comes within the jurisdiction of either of said courts. If there be more than one party against whom a writ is granted, it may be returned and tried in the proper court of the county where either may have his domicile. Acts 1846, p. 363; P.D. 3932; G.L. vol. 2, p. 1669."

Appellant's third point of error is that of the District Court in issuing a temporary injunction against appellant for the reason that the appellees' petition and trial amendments thereto for a temporary injunction on their face show as a matter of law that appellees have a complete and adequate remedy at law.

We overrule this point.

We will not discuss this point further as it has been adequately covered above.

Appellant's fifth point is the error of the court in issuing a temporary injunction against the appellant for the reason that the findings of fact made by the 126th Judicial District Court and which form the basis for its order disposes of appellant's cause in the 53rd Judicial Court without affording appellant the opportunity to have the fact issues in his cause tried before a jury as guaranteed by Article 1, Section 15, of the Constitution of the State of Texas, Vernon's Ann.St.

We overrule this point.

■ The injunction here is temporary and appellant under the wording of the court's order, set out above, may have his day, with jury if he so desires at further proceedings. 31 Tex.Jur.2d, Sec. 187, p. 301.

The judgment of the trial court is affirmed.

Affirmed.

HUGHES, Justice (dissenting).

Because I am of the opinion that the majority has failed to follow applicable judgments and opinions of the Supreme Court, I respectfully dissent.

In Mitchell v. Allis-Chalmers Mfg. Co., 291 S.W. 1099, Tex.Com. of App., the exact procedural situation was presented as exists here. In holding that the suit last filed had dominant jurisdiction over the parties and subject matter of the suit the Court said:

"The fact that a prior suit is pending in another jurisdiction when a second suit involving the same parties and subject-matter is brought does not automatically deprive the court of jurisdiction of the second suit. Unless the pendency of the suit first filed is set up in the second suit by proper pleading, the abatement of the second suit is waived. Cleveland v. Ward [116 Tex. 1], 285 S.W. 1071, and authorities there cited. We think that, as a corollary of the rule that a party may waive the abatement of the second suit, he may become estopped from urging its abatement, if sufficient grounds are shown upon which to base an estoppel.

If a proposed plaintiff contemplates bringing suit immediately in a given court in which he has the right to bring it, and the proposed defendant, knowing of such intention of the proposed plaintiff, fraudulently induces him to postpone the filing of his suit—the proposed defendant purposing at the time to take advantage of the delay thus fraudulently obtained to forestall the plaintiff's contemplated suit by another suit in different county—the plainest principles of equity and fair dealing require that such defendant be estopped from asserting, as ground for abatement, the pendency of the suit so filed by him in consummation of his fraud. In such a case, when the proposed plaintiff files his suit in the court in which he so contemplated bringing it, such court takes and holds the dominant jurisdiction over the parties and subject-matter of the suit, for the reason the defendant will not be permitted to defraud the plaintiff of the benefits of the full and unhampered jurisdiction of that court which, in good conscience, he is entitled to enjoy.

In the instant suit the notes held by the Allis-Chalmers Company were payable in Potter county. In the absence of the pendency of a prior suit involving the same parties and subject-matter, in-

stituted by the defendant, Mitchell, in another jurisdiction without deceit having been practiced on the company for the purpose of defeating such right, the said company had the right to bring its suit on the notes in the district court of Potter county. The defendant, Mitchell, undertook to defraud the company of this right in the manner shown. He should not be permitted to avail himself of the fruits of his fraud."

In Russell v. Taylor, 121 Tex. 450, 49 S.W.2d 733, Tex.Com. of App., the same procedural problem was present and the Court stated that it was only necessary to quote from Mitchell v. Allis-Chalmers, supra, to ascertain the correct disposition to be made of the matter. After quoting from such decision, the Court stated:

"In the case at bar it appears that the district court of the 14th judicial district in Dallas county has all the parties in interest before it, though it further appears that the 102d district court in Red River county had filed therein the suit previous to the filing of the suit in the 14th judicial district court in Dallas county, and, under the authority of Cleveland v. Ward, supra, the 102d judicial district court of Red River county would be held to have first acquired jurisdiction of the subject-matter of the suit, but for the situation presented by the filing of the plea in abatement in the 14th judicial district court in Dallas county, and the reply thereto, *which involves questions of fact determinable only by the trial judge in the 14th judicial district court in Dallas county, which questions of fact are necessary to be finally determined by the judge of the latter named court before the question of dominant jurisdiction in one or the other of the said courts can be determined,* and in this respect the case at bar differs in its facts from that of Cleveland v. Ward, supra, and Conn et al. v. Campbell, District Judge, supra [119 Tex. 82, 24 S.W.2d 873].

The relator has the right to have his plea in abatement sustained by the trial judge of the 14th judicial district court in Dallas county, unless the respondent corporation, upon the trial before the judge of the 14th judicial district court in Dallas county, shall be able to sustain its allegations of fact, heretofore stated, *in which event the law would compel the judge of the 14th judicial district court to overrule the relator's plea in abatement, which would have the effect to give to the 14th judicial district court in Dallas county dominant jurisdiction of the case, though it would not necessarily follow that this action would have the effect to abate relator's suit filed in the 102d judicial court in Red River county, but it would have the effect to postpone any action in that case by the court until the final judgment had been rendered in the case filed in the 14th judicial district court, for the reason that, while the judge of the 14th judicial district court of Dallas county would have the exclusive authority to pass upon these questions of fact, its action would be subject to review upon appeal to the proper appellate court, which appellate court might possibly reach the conclusion that under the facts the district court of the 102d judicial district in Red River county had acquired dominant jurisdiction over the case before the suit was filed in the 14th judicial district court in Dallas county."* (Italics mine.)

The Court thereupon issued instructions that further proceedings in the two cases be absolutely controlled by the final disposition of the plea in abatement filed in the second suit.

V. D. Anderson Co. v. Young, 128 Tex. 631, 101 S.W.2d 798, is an identical case in its procedural aspects. There it was contended that the second suit was not filed first due to the fraud of the opposite par-

ties. There Justice Critz, in speaking for the Court said:

"The general rules of law governing cases of this character have been so well settled by the decisions of this court and its commissions that we deem it unnecessary to repeat them here. In the case at bar both the district courts involved have potential jurisdiction of the subject-matter of this litigation. *The real question at issue is which of such courts ought to be allowed to exercise active jurisdiction.* In deciding that question, we reannounce the following rules of law:

1. It is the general rule in this state that where a suit has been first filed in a court of competent jurisdiction, and such court has all necessary parties before it, or has the power to bring them before it, it has the prior right to exercise active jurisdiction of such case, and no other court in this state in which such suit is subsequently filed has the right to interfere. 11 Tex.Jur. 787, and authorities there cited; Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063; Conn v. Campbell, 119 Tex. 82, 24 S.W.2d 813.

2. *In spite of the above general rule a party may be guilty of such conduct relating to the matter as to estop himself from asserting the prior active jurisdiction of a court in which a suit is first filed over another court in which a suit is subsequently filed involving the same subject-matter and parties.* Russell v. Taylor, 121 Tex. 450, 49 S.W.2d 733; Mitchell v. Allis-Chalmers Mfg. Co. (Tex.Com.App.) 291 S.W. 1099.

\* \* \* \* \* \*

In the case at bar it appears that the district court of Dallas county has all the necessary parties before it to determine the issue of abatement raised in that court. Also, it has all the necessary parties before it to finally try the case in the event the plea in abatement should be overruled. On the other hand, the reply to the plea in abatement has raised fact

issues on at least three very important questions, viz.: (a) Whether the Wheeler county district court can subject all necessary parties to its jurisdiction; (b) whether the Wheeler county suit was filed in good faith; and (c) whether the plaintiffs in the Wheeler county suit were enabled to first file the suit in that court by fraud or deceit. The plaintiffs in the Wheeler county case filed plea in abatement in the Dallas county case. Surely they had the right to file such plea and have it passed on, and equally as surely the plaintiffs in the Dallas county case had the right to reply to and contest such plea in abatement, and have such reply and contest passed on. The reply and contest raised pertinent issues of fact. *If the Dallas county district court had the power, and was burdened with the duty, to pass on such plea in abatement and reply and contest, it had the power, and was burdened with the duty, to hear and determine the pertinent facts.* McCurdy v. Gage, 123 Tex. 558, 69 S.W.2d 56; Powers v. Temple Trust Co., 124 Tex. 440, 78 S.W.2d 951.

The district court of Dallas county did properly exercise its power and jurisdiction to pass on and determine the above plea in abatement, reply thereto, and contest thereof, and all pertinent facts. Such court, in exercising its jurisdiction, overruled such plea in abatement, and its order in such matter, being purely interlocutory, can only be reviewed by an appellate court when a final judgment is rendered in the case. *It follows, under the circumstances of this record, that the district court of Dallas county should not be interfered with until it has finally tried the case, and until it has been finally determined whether it was in error in its action in overruling the plea in abatement. Of course this will have the effect of postponing any action in the Wheeler county case until final judgment in the Dallas county case.* It may be that on appeal, should there be one, the appellate court will determine that the district court

of Wheeler county should be allowed to hear and determine the litigation in preference to the district court of Dallas county. We do not decide that question, but leave it for final decision when, and if, the Dallas county case is appealed. Russell v. Taylor, supra. (Italics mine.)

The Court thereupon issued appropriate instructions to implement its decision.

That these decisions are currently respected one needs to read only the opinion in Wheeler v. Williams, 158 Tex. 383, 312 S.W.2d 221. See also Darsey v. Darsey, Tex.Civ.App., 196 S.W.2d 524, Galveston, n. w. h. and McCurdy v. Gage, 123 Tex. 558, 69 S.W.2d 56, where Judge Sharp for the Texas Commission of Appeals held that the judgment of the second court in ruling on a plea in abatement pleading pendency of a prior suit "will be respected until vacated or set aside by proper procedure, where an effective legal remedy is available."

The majority distinguishes these cases saying, in part, "The injunction was brought under the equity power of the court to protect the appellees, temporarily, from irreparable injury where his remedy at law was inadequate."

The essence, as I understand it, of appellees' complaint is that appellant has brought an unjust, unfounded suit against them. Conceding, but as to which I express no opinion, that such be the case, still equity has no power to intervene for the reason that the legal remedy of defense to the suit is adequate.

The rule is stated in 43 C.J.S. Injunctions § 40, p. 481 as follows:

"Matters that will constitute a defense of which complainant may avail himself in an action pending or threatened against him cannot be made the ground of an injunction to restrain proceedings in such action, unless he alleges and proves special circumstances showing that he may suffer irreparable injury if he is denied the preventive remedy, * * *."

This is the rule in Texas, Lancaster v. Lancaster, 155 Tex. 528, 291 S.W.2d 303, and cases therein cited. In Gibson v. Moore, 22 Tex. 611, Chief Justice Wheeler for the Court stated the law to be, "It is very clear, that matter which will constitute a defense, of which a party may avail himself in a suit pending against him, cannot be made the ground of an injunction to restrain proceedings in the suit."

There is no suggestion that appellees may not make any defense they desire to make in the suit filed by appellant in the 53rd District Court. The court below, 126th District Court, recognized that there could be a trial of appellant's claims because he expressly provided that appellant could litigate, in his court, "defensively or affirmatively, such bona fide causes of action, if any they have, as against plaintiffs, arising out of the controversy between the parties hereto."

The only question presented here is whether this litigation should be in one court or the other. Under the decisions cited above and accepting the findings made on the plea in abatement proceedings in the 53rd Court, trial of this controversy must be held in the 53rd Court to the exclusion of any present right of the 126th District Court to interfere with it, such trial, of course, to be the subject of an appeal if desired.

I would dissolve the injunction and issue instructions to the trial court similar to those found in the cases as above indicated.